ASSOCIATION OF AMERICAN MEDICAL COLLEGES; American Medical Association; The American Hospital Association; Association of Academic Health Centers; California Medical Association; California Healthcare Association; Healthcare Association of New York State; Medical Group Management Association; The Regents of the University of California, on behalf of the University of California, San Diego School of Medicine, UCLA School of Medicine, University of California–Davis School of Medicine, University of California–Irvine College of Medicine and University of California–San Francisco School of Medicine; Loma Linda University Healthcare, Inc.; Allegheny University of the Health Sciences; University of Colorado; Trustees of Indiana University; The John Hopkins University; Regents University of Michigan; Montefiore Medical Center; Board of Regents of the University of Nebraska; Board of Regents University Medical Associates; State University of New York; Medical College of Wisconsin; University Physicians Inc. and University of Maryland Neurosurgery Associates PA; University of Maryland Physical Therapy Associates PA; University of Maryland Diagnostic Imaging Specialists; University of Maryland Pathology Associates PA; University of Maryland Anesthesia Associates PA; University of Maryland Dermatologies PA; University of Maryland Oncology Associates PA; University of Maryland Family Medicine Associates PA; University of Maryland Psychiatry Associates PA; University of Maryland Emergency

Medicine Associates; Shock Trauma Associates PA; University of Maryland Radiation Oncology Associates PA; University of Maryland Medicine PA; University of Maryland Neurology Associates PA; University of Maryland OB/GYN Associates PA; University of Maryland Pediatric Associates PA; University of Maryland Eye Associates PA; University of Kansas; Kansas University Anesthesiology Foundation; Kansas Family Medical Foundation; Kansas University Internal Medicine Foundation; Kansas University Neurological Foundation; Kansas University Gynecological & Obstetrical Foundation; Kansas University Otolaryngology–Head & Neck Surgery Foundation; University Pathology Associates; Kansas University Childrens Center Foundation; Kansas University Psychiatry Foundation; Kansas University Clinical Radiology Foundation; Kansas University Radiation Therapy Foundation; Kansas University Rehabilitation Medicine Association; Kansas University Surgery Association; Kansas University Ophthalmic Foundation; Massachusetts Hospital Associations, Inc.; American Medical Group Association; American College of Cardiology; American Academy of Otolaryngology–Head & Neck Surgery; Association of Academic Physiatrists; American College of Rheumatology; American Society of Clinical Pathologists; American College of Surgeons; American Academy of Orthopedic Surgeons; American Academy Ophthalmology; American Association of Neurological Surgeons; Congress of Neurological Surgeons; American Lung Association and its Medical Section the American Thoracic Society; American Urological Association; American Academy of Dermatology; American Society of Anesthesiologists; Society of Thoracic Surgeons; American Academy of Family Physicians; American Psychiatric Associa-

tion; American Society of Plastic and Reconstructive Surgeons; American Academy of Pediatrics; American College of Osteopathic Surgeons; Association of Academic Departments of Otolaryngology–Head & Neck Surgery, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 98–56190.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 8, 1999

Filed July 11, 2000

Leonard C. Homer, Baltimore, Maryland, and Harry R. Silver, Washington, D.C., for the plaintiffs-appellants.

Peter Robbins, United States Attorney, Civil Division, for the defendant-appellee.

Before: FLETCHER, KOZINSKI, & THOMPSON, Circuit Judges.

FLETCHER, Circuit Judge:

This is an action for declaratory and injunctive relief brought by the American Association of Medical Colleges, the American Medical Association, a host of other medical associations, and numerous teaching hospitals against the Office of the Inspector General for the Department of Health and Human Services and the Department of Justice. Plaintiffs allege that the government has initiated a nationwide program of audits for reimbursements made to teaching hospitals under Part B of the Medicare Act, that the audits are based on unlawful or retroactively applied standards for Medicare billing, and that, on threat of suit under the False Claims Act, the audits are being used to coerce settlements. The district court dismissed the action for lack of subject matter jurisdiction on defendant's motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, ruling that the action is premature because there has been no final agency action, plaintiffs have adequate alternative remedies, and the issues are not ripe for adjudication. Although we affirm on grounds that there is no case or controversy under Article III of the Constitution, we order the case dismissed without prejudice.

### FACTS AND PROCEDURAL HISTORY

This case arises out of efforts by the Secretary of Health and Human Services (the "Secretary") to review Medicare Part B billings by teaching hospitals and to recover potential overpayments for services rendered by such hospitals to Medicare beneficiaries. The review is called

the Physicians at Teaching Hospitals ("PATH") program, and is conducted in the form of audits by the HHS's Office of the Inspector General ("OIG").[1] After a PATH audit of the billings submitted by the University of Pennsylvania Health System produced a settlement of over $30 million for the government for Medicare claims submitted between 1989 and 1994, the review was extended to teaching hospitals nationwide. The key findings in the University of Pennsylvania PATH audit were (1) a lack of documentation showing the physical presence of the teaching physician during a service performed by a resident and subsequently billed for payment under Medicare Part B, and (2) "upcoding"—i.e., billing for a more complex level of care than that which was provided. According to the government, services performed by a resident may be billed to Medicare Part B by a teaching physician only if that physician was present during the performance of the service.

Plaintiffs, comprising nearly all the major medical associations in the country along with several major teaching hospitals currently subject to PATH audits, filed a complaint in October 1997, alleging (1) that the PATH audits apply billing requirements beyond those set forth in the Medicare Act and HHS regulations, and (2) that the audits are being used along with the threat of ruinous penalties under the False Claims Act to coerce settlements. Fourteen plaintiff hospitals and affiliated practice groups were subject to PATH audits as of February 1998. At least one audit has concluded with a finding of no Medicare fraud or abuse and at least one plaintiff (the University of California) has been named in a qui tam suit by an individual who alleges Medicare fraud in the hospitals' Part B billings.[2] A brief review of the billing requirements historically imposed on teaching hospitals will illustrate why plaintiffs are so deeply concerned by the PATH audits.

Title XVIII of the Social Security Act of 1935 establishes a federally subsidized health insurance program for elderly and disabled persons. 42 U.S.C. § 1395 (the "Medicare Act"). While Part A of the Medicare Act covers institutional health costs, such as hospital expenses (e.g., room, board, nursing, residents' salaries, and other inpatient care costs), see 42 U.S.C. §§ 1395c–1395i–2, Part B covers medical services provided directly to individuals on a fee-for-service basis such as physician services, medical supplies, and diagnostic/laboratory tests. See 42 U.S.C. §§ 1395j–1395w. Coverage and payment for services rendered to beneficiaries is administered by the Secretary through the Health Care Financing Administration ("HCFA"). For Medicare Part B claims, the HCFA contracts with approximately 34 private insurance companies nationwide ("Carriers") to process claims and to perform payment safeguard functions. See 42 U.S.C. § 1395u.

In order to obtain payment for Part B services rendered at teaching hospitals, the regulations traditionally required (1) that the teaching physician establish an "attending physician" relationship with the patient, and (2) that the services rendered be "of the same character, in terms of the responsibilities to the patient that are assumed and fulfilled," as the services provided to paying patients. 20 C.F.R. § 405.521 (1968). Although payment of residents' salaries is covered under Medicare Part A, services performed by residents *under the direction of teaching*

---

1. Audits initiated by OIG offer hospitals the choice of either submitting to audit directly by OIG ("PATH I"), or paying for their own OIG approved auditor ("PATH II"). The Department of Justice ("DOJ") has also cooperated with OIG by initiating its own investigations under the False Claims Act.

2. Unless the government has decided to intervene, the qui tam suit will presumably be short lived. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* —— U.S. ——, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (state is not a "person" under False Claims Act where private individual brings suit).

*physicians* qualified for Part B reimbursement where (1) the teaching physician furnished "personal and identifiable direction to interns or residents who are participating in the care of his patient," or (2) in the case of "major surgical procedures and other complex and dangerous procedures or situations," the attending physician provided direction "in person." 20 C.F.R. § 405.521(b) (1968).

With respect to documentation of the teaching physician's role in services provided, HCFA simply required that "[p]erformance of the activities ... must be demonstrated, in part, by notes and orders in the patient's records that are either written by or countersigned by the supervising physician." Bureau of Health Insurance Intermediary Letter No. 372, at 3 (April 1969). In other words, countersignature by the teaching physician would adequately document his or her personal supervision of services provided to the patient. *See id.*; Bureau of Health Insurance Intermediary Letter No. 70–2 (January 1970) (answer to question # 22).

In 1980, Congress amended the Medicare Act, incorporating the medical direction standard set forth in 20 C.F.R. § 405.521 (1968), but omitting any reference to the "attending physician" concept or the personal presence requirement for major surgery and dangerous or complex procedures. As amended, the Act provided that no payment may be made for teaching physician services

> unless the physician renders sufficient personal and identifiable physicians' services to the patient to exercise full, personal control over the management of the portion of the case for which payment is sought [and] the services are of the same character as the services the physician furnishes to patients not entitled to benefits under this subchapter....

42 U.S.C. § 1395u(b)(7)(A)(i)(I)-(II) (1980).

The Secretary and HCFA have repeatedly acknowledged that, at least prior to 1996, the standards for personal presence and documentation by teaching physicians were less than clear. *See* 60 Fed. Reg. 63,138 (Dec. 8, 1995) (Secretary concedes that I.L. 372 is "vague, perhaps necessarily, on the matter of the presence of the physician during ... occasions of inpatient service"); Letter from Harriet Rabb, HHS General Counsel to Jordan J. Cohen, M.D., President of the Assn. of American Medical Colleges, and P. John Seward, M.D., Executive Vice President of the American Medical Association 4 (July 11, 1997) (the "Rabb Letter") (stating that "the standards for paying teaching physicians under Part B of Medicare have not been consistently and clearly articulated by HCFA over a period of decades"); *The Physicians at Teaching Hospitals (PATH) Audits: Hearings before the Subcomm. on Labor, HHS, Education, and Related Agencies of the Senate Comm. on Appropriations,* 105th Cong. 35 (1997) ("*PATH Hearings* ") (testimony of HCFA representative Wynn) ("HCFA has not articulated within IL 372 or some of its other policy issuances a clear and unambiguous policy that the physician needed to be present. There are some explicit statements that the physician should be present in supervising the interning resident; in other cases, it's vague."); *PATH Hearings,* at 5 (statement of Michael F. Mangano, Principal Deputy Inspector General, HHS) (acknowledging that HHS's policy documents "often used the terms 'personal and identifiable services' and 'personal and identifiable direction' interchangeably," and that while some policy documents were clear about physician presence, others "were not as distinctly stated").

Presumably in an effort to address ambiguity in the statutory and regulatory requirements for Part B reimbursements, Carriers often issued policies and guidance to teaching hospitals articulating their view of the personal presence and documentation requirements. These policies varied widely by Carrier in terms of the degree of physician involvement required. As the Complaint alleges, the rules

"ranged from merely repeating or paraphrasing the text of the regulation or I.L. 372 to improperly adding additional requirements for physical presence and documentation thereof not found in, or inconsistent with, § 1395u(b)(7), § 405.521, and/or I.L.372." Compl. ¶ 31; *see also* 54 Fed.Reg. 5948 (1989) (admitting that existing regulations were somewhat unclear and were interpreted differently by different teaching hospitals); *cf. PATH Hearing,* at 5 (statement of Mangano) (estimating that 75% of teaching hospitals received clear guidance from Carriers requiring physical presence of physician for all services billed under Medicare Part B).

On December 8, 1995, after years of struggling with the issue, the Secretary published final regulations revising the requirements for Part B Medicare claims by teaching physicians. *See* 42 C.F.R. §§ 415.150–190 (effective July 1, 1996). According to the new regulations, payment for services performed by residents and directed by teaching physicians is limited to services for which the teaching physician is *physically present. See id.* at § 415.172. Both the "attending physician" and the "of the same character" requirements are eliminated. Moreover, the new regulations require more than a mere countersignature of the resident's notes by the teaching physician as documentation of personal presence. "[T]he medical records must document [that] the teaching physician was present at the time the service is furnished." *Id.*

In 1995, HCFA and the American Medical Association also adopted new documentation guidelines for coding and billing of so-called evaluation and management ("E & M") services. The guidelines were based on regulations originally promulgated in 1991. *See* 56 Fed.Reg. 59,502, 59,-792–801 (Nov. 25, 1991) (effective Jan. 1, 1992). E & M services include basic diagnostic services provided by physicians during office or bedside visits such as taking a patient's medical history, the history of the medical problem, physical examination, di-

agnosis and counseling. Prior to the new guidelines, coding and billing of E & M services occurred in terms of a few simple phrases designating the time and comprehensiveness of the service. The new guidelines reflect a dramatic change, requiring precise designation of codes from an extensive set of descriptions of E & M services in the AMA manual of current procedural technology ("CPT–4 Manual").

As soon as the PATH initiative began, plaintiffs complained that OIG and DOJ were retroactively applying the new 1996 physical presence and documentation requirements as well as the 1995 guidance on E & M coding in audits covering the period 1990–96. The AAMC and AMA raised their concerns with the agency and on July 11, 1997, Harriet Rabb, General Counsel to the Secretary, issued a responsive letter. As with all agency communication on the PATH audits, the letter begins by insisting that, however ambiguous the agency's regulations have been, physical presence of the teaching physician is essential to reimbursement under Medicare Part B for services performed by residents:

> As you know, supervision of interns and residents by teaching physicians is reimbursed under Medicare Part A through graduate medical education (GME) payments. By this mechanism, teaching physicians are paid for taking responsibility for the hospital's oversight of its doctors in training. *It would be absurd to assert that physicians could receive the significant remuneration that characterizes Part B reimbursement for supplying the same level of services that qualifies and was paid for as Part A services.* The *physical presence of a physician* with the treating intern or resident *at the time of treatment* is one clear indication of a more patient-specific level of responsibility for the physician entitling her or him to Part B, rather than Part A, reimbursement. That view is consistent both with common sense and the [statutory and regulatory history].

Rabb Letter at 1–2 (emphasis added); *see also PATH Hearings,* at 4 (statement of Mangano) ("In light of [the] direct and indirect payments for training, the teaching physicians may not submit claims for payment to Medicare Part B for the same general supervision of residents and interns already paid for under Part A. Teaching physicians seeking reimbursement under Part B must do more. Physicians claiming Part B reimbursement for services performed by the intern or resident alone are making a duplicate claim. . . ."); JUNE GIBBS BROWN, INSPECTOR GENERAL, HHS, STATUS REPORT: OIG/DOJ JOINT PROJECT REVIEW OF MEDICARE PART B BILLINGS BY PHYSICIAN GROUP PRACTICES AT TEACHING HOSPITALS 4 (1996) (same).[3]

The Letter nevertheless goes on to make several assurances regarding future PATH audits. First, Rabb states that due to regulatory confusion as to the proper standard for teaching physician presence, only teaching hospitals that previously received clear written guidance from their Carrier that physical presence was necessary will be subject to PATH audits.[4] Second, any hospital approached for a PATH audit "will have the opportunity to show, as a matter of fact, that it or the teaching physicians at the institution received guidance from the carrier which the hospital views as contradictory. . . ." Rabb Letter at 6. Third, unless it is auditing a hospital's compliance with the physical presence requirement, OIG will not audit a hospital's E & M coding. *Id.* Finally, because hospitals were still training on the new coding

---

3. Plaintiffs' view is diametrically opposed. According to the President of the AAMC, for the last 30 years teaching physicians have understood the regulations to require the physical presence of the physician for major surgeries and all other complex procedures. But for simple procedures, Medicare Part B billing was acceptable so long as the teaching physician established an "attending physician" relationship with the patient and provided *medical direction* to the residents involved in providing care to the patient. Also, a countersignature on the patient's medical records was adequate documentation of the physician's role:

> In the cases of major surgery and other complex procedures, in order to bill for the services, the teaching physician must have been physically present, elbow-to-elbow with the resident and prepared to perform the procedure if necessary. That standard was clear, everyone understood it and everyone should be held accountable to it. The majority of cases, however, do not involve major surgery or other complex procedures. . . .
> The teaching physician's presence is obviously required to provide medical direction, and HCFA stipulated that countersignature, countersigning the note in the medical record written by the involved resident provided presumptive evidence of that presence for billing purposes.
> The [Inspector General] has interpreted HCFA's medical direction standard to require the teaching physician to be elbow-to-elbow with the resident in these nonsurgi-

cal instances [and] the Inspector General is insisting that contrary to the standard practice in this country for 30 years or more since Medicare was enacted that countersignature does not constitute adequate documentation of the teaching physician's presence when IL 372 clearly stipulated that that was an adequate documentation. We've attempted on a number of occasions to persuade the Inspector General that the relevant language in the governing Medicare laws and regulations do not support the present PATH audit parameters, but thus far, the IG has insisted on an interpretation of those governing standards that simply does not conform to the reality of the time.

*PATH Hearings,* at 15–16 (testimony of Jordan J. Cohen, M.D.).

4. The letter states:

> [T]he OIG will undertake PATH audits only where carriers, before December 30, 1992, issued clear explanations of the rules regarding reimbursement for the services of teaching physicians. Thus, claims for services of teaching physicians will be considered for a PATH I or II audit only where a carrier provided written guidance stating that Part B reimbursement for teaching physician services would be limited to . . . when the teaching physicians either *personally furnished services* to Medicare beneficiaries *or were physically present* when the services were furnished by interns or residents.

Rabb Letter at 5 (emphasis added).

rules, only "egregious cases of abuse or fraud" in E & M coding will be pursued for the period prior to August 1995. *Id.*

Plaintiffs filed their complaint just a few months after the Rabb Letter. They allege that OIG has impermissibly elevated Carrier policies to legal requirements for purposes of assessing Medicare Part B payments. They also challenge the E & M auditing and the government's determination that a physician's countersignature (on medical reports drafted by residents) is insufficient to establish the physician's presence. Plaintiffs charge that these actions violate the Medicare Act, the Administrative Procedure Act, and the Due Process Clause of the Fifth Amendment. Compl. ¶¶ 72–76. On the due process front, plaintiffs claim that the PATH is unconstitutional to the degree that (1) Carrier guidance rather than national standards set forth in the Medicare Act and relevant agency regulations now determines whether a hospital will be audited, *id.* ¶ 73, (2) audited hospitals are not permitted to submit evidence outside the records reviewed by the auditors, *id.* ¶ 77, and (3) the audits are predicated on inappropriately small statistical samples of hospital billing records. *Id.* at ¶ (e). Plaintiffs also claim that the government's coercive use of potential False Claims Act liability to "obtain participation in an OIG/DOJ team audit process and thereby [favorable settlements] . . . is a violation of the doctrine of unconstitutional conditions and an abridgement of [plaintiffs'] due process rights. . . ." *Id.* at ¶ 79. Plaintiffs seek declaratory and injunctive relief.

When plaintiffs moved for summary judgment, the government opposed the motion and filed a separate motion to dismiss for lack of subject matter jurisdiction. Finding the action premature, the district court granted the motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure and entered judgment for the government. The court reasoned that the government's actions are not reviewable under the Administrative Procedure Act because the actions are not final and plaintiffs may challenge the legality of the actions in any False Claims Act suit brought by the government if and when a PATH audit reveals misconduct and the government decides to sue. Following *Texas v. United States,* the court further held that plaintiffs' action fails on ripeness grounds because the complaint seeks to enjoin and declare invalid "contingent future events that may not occur as anticipated, or indeed may not occur at all." 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998) (internal quotation marks omitted). We have jurisdiction to review the court's order pursuant to 28 U.S.C. § 1291, and we affirm in part and reverse in part.

## STANDARD OF REVIEW

Dismissal for lack of subject matter jurisdiction is reviewed *de novo.* *Crist v. Leippe,* 138 F.3d 801, 803 (9th Cir.1998). The district court's findings of fact relevant to its determination of subject matter jurisdiction are reviewed for clear error. *See Kruso v. Int'l Tel. & Tel. Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989). For motions to dismiss under Rule 12(b)(1), unlike a motion under Rule 12(b)(6), the moving party may submit

> affidavits or any other evidence properly before the court. . . . It then becomes necessary for the party opposing the motion to present affidavits or any other evidence necessary to satisfy its burden of establishing that the court, in fact, possesses subject matter jurisdiction. The district court obviously does not abuse its discretion by looking to this extra-pleading material in deciding the issue, even if it becomes necessary to resolve factual disputes.

*St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.1989) (citations omitted); *see also Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) ("Federal courts are courts of limited jurisdiction. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of

establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted).

## DISCUSSION

### I.  42 U.S.C. § 405(h)

After we heard oral argument in this case, the Supreme Court decided *Shalala v. Illinois Council on Long Term Care, Inc.,* —— U.S. ——, 120 S.Ct. 1084, 146 L.Ed.2d 1 (2000). In *Illinois Council,* the Court held that 42 U.S.C. § 405(h) (as incorporated into the Medicare Act through 42 U.S.C. § 1395ii), is a complete bar to federal question jurisdiction for claims arising under the Medicare Act unless "application of § 405(h) would not simply channel review through the agency, but would mean no review at all." —— U.S. at —— – ——, 120 S.Ct. at 1096–97. Section 405(h) provides:

> The findings and decisions of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.*

42 U.S.C. § 405(h) (emphasis added). Because the Act provides an administrative mechanism for reviewing the nursing home sanction provisions at issue in *Illinois Council,* the Court held that plaintiffs could not escape the § 405(h) bar.[5]

Following *Illinois Council,* we are obliged to inquire whether there is an administrative channel for review of adverse determinations following a PATH audit. If such a channel exists, § 405(h) precludes this suit. The short answer is that there are administrative channels of review for some, but not all, of the courses of action open to OIG and the Secretary once violations of the Act are identified.[6] But because we do not know which course the agency will pursue, we cannot decide whether § 405(h) applies at this juncture.

### II.  Ripeness

■■■ It is well settled that "injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The basic purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–49, 87 S.Ct. 1507. Thus, in evaluating ripeness, courts assess "both the fitness of

---

5. The Court so held notwithstanding plaintiffs' insistence that they could not avail themselves of the administrative review process because to do so they would have to risk termination of their provider agreements. —— U.S. at ——, 120 S.Ct. at 1098.

6. Under the Inspector General Act of 1978, "[e]ach Inspector General shall report to and be under the general supervision of the head of the [agency] involved...." 5 U.S.C.App. 3 § 3(a). The Inspector General is authorized to "conduct, supervise, and coordinate audits

and investigations relating to the programs and operations of [the agency]." *Id.* § 4(a)(1). If an audit discloses potential criminal liability, OIG must report "expeditiously to the Attorney General." *Id.* at § 4(d). DOJ may then bring criminal charges or a civil action under the False Claims Act. Otherwise, the Secretary retains discretion to pursue administrative sanctions. If the Secretary proceeds under 42 U.S.C. §§ 1320a–7, 1320a–7a(a), 1395ff, or 31 U.S.C. §§ 3801–3812, the § 405(h) bar arguably applies.

the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507.

### A. Fitness for Judicial Review

■■■ Under the first prong, "agency action is fit for review if the issues presented are purely legal and the regulation at issue is a final agency action." *Anchorage v. United States,* 980 F.2d 1320, 1323 (9th Cir.1992) (citations omitted). Courts traditionally take a pragmatic and flexible view of finality. *See Abbott Laboratories,* 387 U.S. at 149–50, 87 S.Ct. 1507. "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts,* 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). We have accordingly looked to the following elements: whether the administrative action is a definitive statement of an agency's position; whether the action has a direct and immediate effect on the complaining parties; whether the action has the status of law; and whether the action requires immediate compliance with its terms. *See Mt. Adams Veneer Co. v. United States,* 896 F.2d 339, 343 (9th Cir. 1989), *see also Anchorage,* 980 F.2d at 1323; *Ukiah Valley Medical Ctr. v. Fed. Trade Comm'n,* 911 F.2d 261, 264 (9th Cir.1990) ("The general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process.'") (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.,* 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948)); *Sierra Club v. Nuclear Regulatory Comm'n,* 825 F.2d 1356, 1362 (9th Cir.1987) ("We will not entertain a petition where pending administrative pro-

ceedings or further agency action might render the case moot and judicial review completely unnecessary.") (citation omitted). Informal or "tentative" regulations are not final. *See Abbott Laboratories,* 387 U.S. at 151, 87 S.Ct. 1507.

The Supreme Court has recently held that even final agency rules may not be fit for review unless the rule has been concretely applied to the plaintiff. *See Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 891, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("a regulation is not ordinarily considered ... 'ripe' for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"; holding unripe a general challenge to Bureau of Land Management's "land withdrawal review program").

The core issues in plaintiffs' challenge to the PATH audits are indeed purely legal: (1) whether OIG can apply Carrier policies on physical presence when the Medicare Act and applicable regulations were ambiguous on the physical presence requirement; (2) whether OIG can require more than the teaching physician's countersignature to establish the physician's presence and supervisory role; and (3) whether the 1995 E & M coding standards are retroactively enforceable.

■■■ Although judicial resolution of these important questions might aid the parties, the challenged agency actions are not final. Even if we were to assume that OIG has taken a definitive position on the nature and scope of the PATH audits—i.e., that physical presence is required for all services and that countersignature is inadequate documentation of presence [7]—the

---

**7.** The assumption is not unwarranted given the agency's repeated claim that Part B cannot cover any services residents perform in the absence of their instructors. Nevertheless, it is worth noting that of the numerous

declarations submitted by deans at teaching hospitals currently subject to PATH audits, none aver that Carrier physical presence requirements, as opposed to Medicare Act or DHHS regulatory mandates, are or will be

audits themselves do not "impose an obligation, deny a right, or fix some legal relationship as a *consummation* of the administrative process." *Chicago & S. Air Lines,* 333 U.S. at 113, 68 S.Ct. 431 (emphasis added). An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action. *See Jobs, Training & Services, Inc. v. East Tex. Council,* 50 F.3d 1318, 1324–25 (5th Cir.1995) (" '[A]n agency's initiation of an investigation does not constitute final agency action.' ... Judicial intervention at [the investigative] stage will deter rather than foster effective administration of the statute.") (quoting *Veldhoen v. United States Coast Guard,* 35 F.3d 222, 225 (5th Cir.1994)); *Winter v. California Medical Review Inc.,* 900 F.2d 1322, 1325–26 (9th Cir.1989) (since the agency's conclusions could change with additional information "[a]ppellant's claim that the investigation itself represented final agency action lacks merit.... This court must give the agency an opportunity to formulate a final position."); *O'Brien, Inc. v. Sec. & Exch. Comm'n,* 704 F.2d 1065, 1067 n. 6 (9th Cir.1983) ("District court review of the propriety of SEC actions in its investigation would ... have been inappropriate because 'final agency action,' a prerequisite to judicial review, had not yet occurred.") (citing *Fed. Trade Comm'n v. Standard Oil Co. of Cal.,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980)), *rev'd on other grounds,* 467 U.S. 735, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984); *Dresser Indus., Inc. v. United States,* 596 F.2d 1231, 1235 (5th Cir.1979) (SEC and DOJ investigation is not final agency action).

More importantly, on the facts before this court it is an open question whether the PATH audits will actually result in findings of abuse or fraud. For obvious reasons, plaintiffs have not admitted in their pleadings that they stand in violation of the Medicare Act as interpreted by OIG. We might infer this fact, but its absence from the *record* demonstrates a lack of finality. OIG could still modify its rather draconian view of the Act's requirements for Part B billing, and, for any number of reasons, the PATH audits may not reveal significant violations. Even if violations are found, there are a panoply of administrative and judicial remedies open to the Secretary and DOJ, at least some of which we might be without jurisdiction to review under 42 U.S.C. § 405(h) and *Illinois Council. See supra* § I. And only one of those remedies (settlement under threat of False Claims Act liability) presents the dire Hobson's choice plaintiffs complain of.

■ As a review of recent Supreme Court precedent confirms, the district court properly concluded that these uncertainties render plaintiffs' action unfit for judicial resolution at this time. In *Texas v. United States,* the Supreme Court considered a ripeness challenge to an action brought by the State of Texas seeking a declaratory judgment that preclearance provisions of the Voting Rights Act do not apply to state laws permitting sanctions for local school districts that fail to meet state-mandated performance criteria. 523 U.S. at 297–98, 118 S.Ct. 1257. The Court deemed the case unfit for judicial resolution because the feared sanctions that

used to assess Medicare Part B billings. Thus, we have no way of knowing what standards OIG is actually using in plaintiffs' PATH audits.

Moreover, the Rabb Letter and subsequent communication from the OIG suggest that the agency has been willing to shift the parameters of the PATH audit in response to plaintiffs' concerns. Indeed, the transition from nationwide audits to audits focused on hospitals who received clear Carrier guidance re-

flects just such a shift. *See also* Declaration of George Reeb, Assistant Inspector General for HCFA ¶¶ 3, 5 (Feb. 12, 1998) (indicating that PATH audits will focus on a twelve-month period between 1994 and 1996, and that PATH audit results will not be finalized or forwarded to the Attorney General until after the audited entity has had an opportunity to review the findings, provide additional information or documents and submit a response).

would implicate Voting Rights Act preclearance were contingent on a host of factors: (1) a school district falling below the state standards; (2) imposition of lesser sanctions required by the applicable state law; and (3) a determination that the lesser sanctions failed and that greater sanctions are necessary. *Id.* at 300–01, 118 S.Ct. 1257. As the Court stated:

> A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.... Under these circumstances, where we have no idea whether or when such [a sanction] will be ordered, the issue is not fit for adjudication.

*Id.* at 300, 118 S.Ct. 1257 (internal quotation marks and citations omitted).

In *Ohio Forestry Ass'n, Inc. v. Sierra Club,* the Sierra Club "challenge[d] the lawfulness of a federal land and resource management plan adopted by the United States Forest Service for Ohio's Wayne National Forest on the ground that the plan permits too much logging and too much clearcutting." 523 U.S. 726, 728, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). Although the plan made logging possible, and even likely, the Court dismissed the case as unripe because the plan itself did "not authorize the cutting of any trees." *Id.* at 729, 118 S.Ct. 1665. The Forest Service was required to take at least five additional steps beyond the plan before permitting any logging. *Id.* at 729–30, 118 S.Ct. 1665. Accordingly, the Court held that immediate judicial review would unnecessarily interfere with the administrative process and

> would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time. That review would take place without the benefit of the focus that a particular logging proposal could provide.... And, of course, depending upon the agency's future actions to revise the Plan or modify the expected methods of implementation, review may now turn out to have been unnecessary.... *All of this is to say that further factual development would "significantly advance our ability to deal with the legal issues presented" and would "aid us in their resolution."*

*Id.* at 736–37, 118 S.Ct. 1665 (emphasis added) (citing *Standard Oil Co.,* 449 U.S. at 242, 101 S.Ct. 488, and quoting *Duke Power Co. v. Carolina Envt'l Study Group, Inc.,* 438 U.S. 59, 82, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). *See also Dalton v. Specter,* 511 U.S. 462, 469–70, 114 S.Ct. 1719, 128 L.Ed.2d 497 (1994) (Secretary of Defense's and commission's recommendations for base closures not final agency action where President's approval is a prerequisite to actual base closures) (following *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636); *Nat'l Wildlife Federation,* 497 U.S. at 890–91, 110 S.Ct. 3177 (BLM's general land management program is not final agency action for purposes of ripeness; plaintiffs must await concrete, particular application of program).

Although plaintiffs are currently subject to concrete agency action in the form of PATH audits (and plaintiffs' case is therefore less abstract than the claims asserted in *Texas v. United States* and *Ohio Forestry* ), the actions are not final and their outcomes turn on contingencies which the court is ill-equipped to predict. Plaintiffs' case would indeed be moot if the auditors are not relying on Carrier rules and retroactive application of the 1995 E & M guidelines. Plaintiffs' case would also be moot if the OIG/DOJ teams decide to abandon reliance on these standards, if the audits turn up no Medicare billing violations, or if coercion is absent from settlement negotiations after violations are found.

### B. The Balance of Hardships

Perhaps recognizing the weakness of their claims under the first prong of the

ripeness analysis, plaintiffs stress an exception that has been recognized under the hardship prong. In *Abbott Laboratories,* the Supreme Court held that a pre-enforcement challenge to a regulation may be ripe where the impact of the regulation is "sufficiently direct and immediate." 387 U.S. at 152, 87 S.Ct. 1507. At issue was a regulation requiring drug manufacturers to designate the generic name of a drug on labels and advertisements where the drug's trade name was printed. Although plaintiffs believed that the regulation exceeded the statutory provision from which it derived, failure to comply immediately opened the possibility of product seizure as well as severe criminal and civil penalties. As the Court described the plaintiffs' dilemma, " '[e]ither they must comply with the every time requirement and incur the costs of changing over their promotional material and labeling or they must follow their present course and risk prosecution.' " *Id.* (quoting district court findings). The Court therefore concluded:

> Where the legal issue presented is fit for judicial resolution, and where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some unusual circumstance, neither of which appears here.

*Id.* at 153, 87 S.Ct. 1507.

■ Strictly speaking, plaintiffs' case falls outside the *Abbott Laboratories* rule since the PATH initiative is not a final rule and it relates to liability for past billing practices rather than requiring a costly change in present conduct. Courts typi-

cally read the *Abbott Laboratories* rule to apply where regulations require changes in present conduct on threat of future sanctions. *See, e.g., Ohio Forestry,* 523 U.S. at 734, 118 S.Ct. 1665 (plaintiff is outside *Abbott Laboratories* rule where agency plan does not "force [plaintiff] to modify its behavior in order to avoid future adverse consequences, as, for example, agency regulations can sometimes force immediate compliance through threat of future sanctions") (citing *Abbott Laboratories,* 387 U.S. at 152–53, 87 S.Ct. 1507; *Columbia Broadcasting System, Inc. v. United States,* 316 U.S. 407, 417–19, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942)). However, plaintiffs are faced with a similar dilemma. If they enter settlement agreements predicated on audit standards that exceed the requirements of the Medicare Act and applicable regulations, they will simultaneously waive their right to challenge the audit standards in court. *See, e.g., Aulenback, Inc. v. Fed. Highway Admin.,* 103 F.3d 156, 161–62 (D.C.Cir.1997) (settlement with agency moots legal challenge to rules applied to induce settlement). On the other hand, if they refuse to settle, they face potentially ruinous liability under the False Claims Act.[8]

But this argument assumes that plaintiffs face an immediate Hobson's choice. Since none of the PATH audits pending against plaintiffs are complete, however, we have no evidence that the government has threatened litigation to obtain settlements. The rule in *Abbott Laboratories* has been carefully circumscribed to regulations that pose an immediate dilemma. Because the Commissioner of Food and Drugs expected immediate compliance with the new regulations, the companies in *Abbott Laboratories* faced an immediate

---

**8.** As in *Abbott Laboratories,* plaintiffs here "deal in a sensitive industry, in which public confidence … is especially important. To require them to challenge these regulations only as a defense to an action brought by the Government might harm them severely and unnecessarily." 387 U.S. at 153, 87 S.Ct. 1507. Indeed, plaintiffs argue that their goodwill and status as teaching hospitals could be irreparably harmed by allegations, let alone findings, of False Claims Act liability for Medicare fraud. And the audits themselves are costly and onerous, taking precious time and resources away from hospital administration and patient care.

choice between adjusting their businesses or disregarding the new rules. *See also Nat'l Wildlife Federation,* 497 U.S. at 891, 110 S.Ct. 3177 (although pre-enforcement review is normally precluded, "[t]he major exception ... is a substantive rule which as a practical matter requires the plaintiff to adjust his conduct immediately") (citing *Abbott Laboratories*). Here, however likely plaintiffs think a settlement/FCA litigation choice may be, the choice is not before them yet, and because the PATH initiative reaches only past conduct, nothing but participation in the audits is demanded of them at present.

The boundaries of the *Abbott Laboratories* exception are confirmed by another decision the Supreme Court issued on the same day. In *Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the Court upheld the dismissal of a pre-enforcement challenge by a cosmetics industry group to regulations promulgated by the Food and Drug Commissioner. The regulations permitted the Commissioner to suspend certification services to any company that refused to allow agency employees to inspect the facilities and processes used in preparing color additives for cosmetic products. Applying the reasoning of *Abbott Laboratories,* the Court found the action unripe because the impact of the regulation was not "felt immediately by those subject to it in conducting their day-to-day affairs." *Id.* at 164, 87 S.Ct. 1520. As the Court reasoned:

> The regulation serves notice only that the Commissioner *may* under certain circumstances order inspection of certain facilities and data, and that further certification of additives *may* be refused to those who decline to permit a duly authorized inspection until they have complied in that regard. At this juncture we have no idea whether or when such an inspection will be ordered and what reasons the Commissioner will give to justify his order.... We believe that judicial appraisal of these factors is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here....
>
> Moreover, no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection.

*Id.* at 163–65, 87 S.Ct. 1520 (emphasis in original).

▮ At this juncture, we can only speculate whether the PATH audits will result in findings of Medicare violations and threats of prosecution under the False Claims Act. Absent a coercive threat of prosecution, plaintiffs' claim is unripe.[9]

---

**9.** Plaintiffs' unconstitutional conditions argument mirrors the *Abbott Laboratories* claim and fails for the same reasons. *See, e.g., Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 218, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) (distinguishing *Ex parte Young,* 209 U.S. 123, 148, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

We also reject plaintiffs argument that "federal question jurisdiction exists whenever substantial constitutional violations are alleged." Appellants' Opening Brief at 34. In support of this proposition, plaintiffs cite a late *Lochner* era takings case and an obscure footnote in a Ninth Circuit Equal Access to Justice Act attorney fees case. *See South Covington & C. St. Ry. Co. v. City of Newport,* 259 U.S. 97, 42 S.Ct. 418, 66 L.Ed. 842 (1922); *Foster v. Tourtellotte,* 704 F.2d 1109 (9th Cir. 1983).

In *South Covington,* the Supreme Court found federal subject matter jurisdiction in an action to enjoin enforcement of a municipal resolution which directed immediate removal of a high-tension wire used to run electrical current in support of plaintiff's perpetual franchises for operating street cars in Newport, Kentucky. Finding "a substantial claim under the Constitution" that the city's action would amount to a taking, the Court held that jurisdiction would not be defeated merely because the city's answer disclaimed an intention to enforce the resolution "except through an order of court." *Id.* at 100, 42 S.Ct. 418 (noting that the "denial went to the merits of the claim" and could not, therefore, defeat jurisdiction). In *Foster,* we merely noted the well recognized rule that, for purposes of establishing federal question jurisdiction, "[a] claim of constitutional violation need not be

## CONCLUSION

Having held that plaintiffs' case is unripe, we AFFIRM its dismissal for want of jurisdiction. However, we REVERSE the district court's dismissal with prejudice and the entry of judgment for the United States. In the time since judgment was entered the PATH audits may have progressed at any number of hospitals to a point where plaintiffs' claims are ripe. Accordingly, the action is DISMISSED WITHOUT PREJUDICE.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

proven." 704 F.2d at 1111 n. 2. Rather, federal courts will exercise jurisdiction unless the constitutional claim " 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.' " *Id.* (quoting *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

But even if federal question jurisdiction may be established by pleading a substantial constitutional claim, the claim must still be ripe for review before courts will exercise jurisdiction. In *South Covington,* the claim was presumably ripe because the city's resolution created the prospect of imminent, forc-

ible removal and destruction of the company's property. Although the Court held that the city's denial of an intention to act in the absence of a court order could not defeat jurisdiction, the holding was predicated on the rule that jurisdiction "must be determined on the allegations of the bill." *South Covington,* 259 U.S. at 99, 42 S.Ct. 418. This rule predates modern Rule 12(b)(1) practice, which allows the court to look beyond the bare allegations of the complaint in order to determine the existence of jurisdiction. Whether statutory or constitutional in origin, an unripe claim is not justiciable.