RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0044P (6th Cir.)
File Name: 04a0044p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————

AIR BRAKE SYSTEMS, INC.,
*Plaintiff-Appellant,*

*v.*

NORMAN Y. MINETA, in his
capacity as Secretary of
Transportation; NATIONAL
HIGHWAY TRAFFIC SAFETY
ADMINISTRATION,
*Defendants-Appellees.*

No. 02-1682

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 01-10308—David M. Lawson, District Judge.

Argued: October 23, 2003

Decided and Filed: February 11, 2004

Before: KEITH, MARTIN, and SUTTON, Circuit Judges.

———————

### COUNSEL

**ARGUED:** Daniel L. Pulter, LOOMIS, EWERT,
PARSLEY, DAVIS & GOTTING, Lansing, Michigan, for

Appellant. Peter R. Maier, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** Daniel L. Pulter, David M. Lick,
LOOMIS, EWERT, PARSLEY, DAVIS & GOTTING,
Lansing, Michigan, for Appellant. Peter R. Maier, Michael
Jay Singer, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., Lloyd Guerci, NATIONAL
HIGHWAY TRAFFIC SAFETY ADMINISTRATION, for
Appellee.

———————

### OPINION

———————

SUTTON, Circuit Judge. This case arises from a
longstanding dispute between the National Highway Traffic
Safety Administration (NHTSA) and Air Brake Systems, Inc.
(Air Brake). Air Brake manufactures a "non-electronic"
antilock brake system for trucks and trailers, which purports
to comply with Federal Motor Vehicle Safety Standard 121,
a NHTSA regulation concerning antilock brakes. When an
Air Brake customer asked NHTSA whether a vehicle with Air
Brake's brake system—the only non-electronic antilock brake
system on the market—would comply with Standard 121,
NHTSA's Acting Chief Counsel issued two opinion letters
stating that the brake system would not satisfy the standard.
NHTSA posted the letters on its website (with negative
consequences for Air Brake's business), but it did not begin
the statutory process for determining whether vehicles
carrying such brakes were noncompliant or the statutory
process for ordering a recall of vehicles with these brakes.

Soon after NHTSA posted the first of these letters on its
website, Air Brake filed this action challenging the Chief
Counsel's conclusion as well as the Chief Counsel's authority
to issue the letter. The district court granted summary
judgment in favor of NHTSA, reasoning that interpretive
letters issued by NHTSA's Acting Chief Counsel do not

constitute "final agency action" subject to judicial review under the Administrative Procedure Act. We agree that the tentative conclusions reached in the letters, which are based in part on Air Brake's representations about its antilock brake system and which NHTSA acknowledges are neither binding on the industry nor entitled to any administrative deference, do not constitute final agency action regarding the meaning of Standard 121 or Air Brake's compliance with that standard. At the same time, however, the letters *do* reflect final agency action with respect to the distinct question whether the Chief Counsel has authority to issue them, because the practice does not lend itself to further review at the agency level and has legal consequences. Yet because the practice of permitting NHTSA's Chief Counsel to issue advisory opinions in response to inquiries from the public does not exceed the Chief Counsel's authority (and indeed has much to recommend it), we affirm the district court's judgment in favor of the Government.

## I.

When Congress enacted the National Traffic and Motor Vehicle Safety Act of 1966, 80 Stat. 718, 49 U.S.C. § 30101 *et seq.*, it directed the Secretary of Transportation to prescribe motor vehicle safety standards. 49 U.S.C. § 30111. The Secretary in turn delegated this task to NHTSA. The first Federal Motor Vehicle Safety Standard was promulgated in 1967 and NHTSA has promulgated numerous other standards since then, including Standard 121 (codified at 49 C.F.R. § 571.121), which covers the requirements for air brake systems used in heavy vehicles.

In 1995, NHTSA amended Standard 121 to require that trucks, buses and trailers equipped with air brakes have an "antilock brake system." *See* Standard No. 121, Air Brake Systems, 60 Fed. Reg. 13,216 (Mar. 10, 1995). The standard defines "antilock brake system" as

a portion of a service brake system that automatically controls the degree of rotational wheel slip during braking by:

(1) Sensing the rate of angular rotation of the wheels;

(2) Transmitting signals regarding the rate of wheel angular rotation to one or more controlling devices which interpret those signals and generate responsive controlling output signals; and

(3) Transmitting those controlling signals to one or more modulators which adjust brake actuating forces in response to those signals.

49 C.F.R. § 571.121, S4. In accordance with this standard, antilock brakes also must have an electrical circuit capable of signaling a malfunction in the brakes through an external warning light. *See id.* §§ 571.121, S5.1.6.2, 5.1.6.3, 5.2.3.2, 5.2.3.3. NHTSA enacted the 1995 amendment amid concerns that only electronic braking systems would satisfy this provision. *See* Standard No. 121, 60 Fed. Reg. at 13,227.

One company concerned about the impact of the amended standard was Air Brake Systems, which manufactures braking systems installed on trucks and trailers. After devoting ten years to developing a pneumatic antilock brake system for trucks and trailers, Air Brake patented its new brake system—the "MSQR-5000"—in 1992. The MSQR-5000 is a non-electronic brake or, in the words of Air Brake, is a "non-computerized antilock braking system which is a combination differential pressure regulator/quick release valve that is installed at each braking axle into the service air lines centered between the brake chambers." J.A. at 94. Air Brake initially sold its non-electronic antilock brakes on the retrofit after-market for used trucks and trailers (which is not subject to Standard 121), but not on the original-equipment market for new trucks and trailers (which is subject to Standard 121).

After NHTSA amended Standard 121, William Washington, the current president of Air Brake, challenged the validity of the rule in federal court. Among other contentions, he claimed that the standard improperly sought to exclude non-electronic antilock brakes from the market and improperly imposed design specifications rather than performance criteria, all in violation of NHTSA's regulatory authority. The Tenth Circuit rejected Washington's challenge. *See Washington v. Dep't of Transp.*, 84 F.3d 1222 (10th Cir. 1996). In doing so, the court noted that a manufacturer "that has devised a new means of obtaining the same or better safety performance" may seek an exemption from a safety standard's requirements, and that "no special exemption would be necessary for a new device *meeting* [an] existing . . . standard[]" if the standard is "purely performative," as opposed to one that requires "a particular type of equipment." *Id.* at 1225 & n.3. Air Brake seized upon this language and at some point began marketing its product as compliant with Standard 121, despite the acknowledged absence of a warning light. J.A. at 225 ("Warning light excluded pursuant to: Tenth Circuit Court of Appeals Case. No. 95-9513 (3/24/96)"). Air Brake represented in its Manufacturer's Certification that "[t]he exclusion of a warning light" in its pneumatic antilock brake system "is permissible pursuant to Washington v. DOT." J.A. at 224.

In January 2001, Air Brake tried to sell the MSQR-5000 to MAC Trailer Manufacturing, a manufacturer of vehicles subject to Standard 121. Because Air Brake's product was the only non-electronic antilock brake system on the market, MAC Trailer asked NHTSA (orally) whether the device met the requirements of Standard 121. NHTSA responded (also orally) that it did not.

A month later, William Washington and consultants hired by Air Brake met with NHTSA to explain the operation and features of the MSQR-5000, in an apparent attempt to persuade NHTSA that the braking system complied with the

agency's safety standards. During the meeting, NHTSA requested that certain tests be performed on the product and that Air Brake submit the test data to the agency. Air Brake scheduled another meeting with NHTSA for this purpose on June 12, 2001.

On June 4, 2001, eight days before the scheduled meeting, NHTSA's Acting Chief Counsel, John Womack, sent a letter to MAC Trailer in response to its earlier oral inquiry and a subsequent written inquiry as to whether the MSQR-5000 satisfied Standard 121. In the letter, the Chief Counsel noted that NHTSA does not pre-approve equipment, and that the applicable statutes make the vehicle manufacturer, not the parts manufacturer, responsible for ensuring compliance with NHTSA's safety standards. Nonetheless, based on NHTSA's review of Air Brake's promotional materials and the "principles involved in [the braking system's] operation," he noted that "the installation of the MSQR-5000 alone would not allow a vehicle to meet [Standard] 121's [antilock brake system] requirement." J.A. at 172. The Chief Counsel expressed specific concern that (1) "the MSQR-5000 does not seem to have any means of automatically controlling wheel slip during braking by sensing, analyzing, and modulating the rate of angular rotation of the wheel," and (2) "the MSQR-5000 also appears to lack any provision for illuminating a warning light providing notification of an [antilock brake system] malfunction." J.A. at 173. NHTSA posted the letter on its website.

Air Brake met with NHTSA as planned on June 12th. At the meeting NHTSA recommended that Air Brake perform certain tests on the brakes. Air Brake conducted the tests and forwarded the results to NHTSA. At the same time, it asked NHTSA to post a letter from Air Brake's counsel on its website so that Air Brake's views about MSQR-5000 and specifically about the brake system's compliance with Standard 121 could be seen by visitors to NHTSA's website alongside the contrary opinion of NHTSA's Chief Counsel. NHTSA never posted the letter.

On August 29, 2001, Air Brake sued Secretary of Transportation Norman Mineta and NHTSA (collectively, NHTSA), challenging the agency's determination that the MSQR-5000 did not comply with Standard 121 and seeking to enjoin NHTSA from continuing to publish the offending letter on its website. The United States District Court for the Eastern District of Michigan denied Air Brake a temporary restraining order, but took Air Brake's motion for a preliminary injunction under consideration and ordered the parties to take the steps necessary for NHTSA to complete its review of Air Brake's product. As a culmination of these steps and as requested by the district court, NHTSA's Acting Chief Counsel issued a letter on December 10, 2001 to Air Brake containing his interpretation and application of Standard 121 to Air Brake's pneumatic brake system. The letter superceded the June 4th letter and essentially reaffirmed the Chief Counsel's conclusion that the MSQR-5000 braking system would not by itself bring a vehicle into compliance with Standard 121.

NHTSA then moved for summary judgment, which the district court granted on the ground that neither the June 4th letter nor the December 10th letter issued by the Chief Counsel constituted "final agency action." Because "the letters contain the opinion of NHTSA's acting chief counsel—a subordinate official—that the plaintiff's product 'alone' will not permit a vehicle to comply with [Standard] 121," the court reasoned that they "represent[] the position the Secretary is likely to take *if and when* proceedings are initiated," not the final action by the Secretary. 202 F. Supp. 2d at 712 (quotation and citation omitted). "More importantly," the court continued, "the Letters do not determine 'rights or obligations' or cause 'legal consequences' to 'flow' [because] [t]he Letters are advisory in nature and have no legal effect." *Id.* The district court also held that "there is ample authority permitting NHTSA's response to MAC Trailer's inquiry and issuance of the letters was not beyond the authority of the agency." *Id.* at 714. Air

Brake appealed the judgment, which we now review de novo. *See Mich. Peat v. EPA*, 175 F.3d 422, 427 (6th Cir. 1999).

## II.

Air Brake raises two essential challenges. It first challenges the merits of "[t]he findings and conclusions contained in the [Chief Counsel's] Letter," including the Chief Counsel's opinion that the MSQR-5000 does not comply with Standard 121. Compl. ¶¶ 83, 84, 96. It then challenges the Chief Counsel's authority to issue opinions on whether a product complies with NHTSA safety standards without following the recall process (*see* 49 U.S.C. § 30118) set forth in the Safety Act. Compl. ¶¶ 83, 88–90, 95, 101.

Before reaching the merits of either challenge, we must consider whether the federal courts have jurisdiction over them under the right to review created by § 10 of the Administrative Procedure Act (APA), 80 Stat. 392, as amended, 5 U.S.C. § 701 *et seq.* In accordance with that provision, federal courts may review two types of agency actions: "[1] Agency action made reviewable by statute and [2] final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In contrast, "[a] preliminary, procedural, or intermediate agency action or ruling [is] not directly reviewable" and may be examined by a federal court only through "review of the final agency action" itself. *Id.* Because no specific statute creates a right to review the agency actions in this case, as the parties agree, the jurisdictional question here is one of statutory interpretation: Do the letters constitute "final" agency action for which no other adequate judicial remedy exists? *See Abbs v. Sullivan*, 963 F.2d 918, 925 (7th Cir. 1992) (Posner, J.) ("Questions of jurisdiction to review the actions of administrative agencies usually are discussed under such murky rubrics as ripeness, prematurity, exhaustion, finality, and standing. However, we can frame the issue in this case (and perhaps not only this case, but generally, though that

remains to be seen) as a straightforward question of statutory interpretation.").

"As a general matter," the Supreme Court has instructed, "two conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process . . . [and] must not be of a tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and citations omitted); *see Alaska Dep't of Envtl. Conservation v. EPA*, No. 02-658, slip op. at 17 (U.S. Jan. 21, 2004) (stating that "to be final" under *Bennett*, "agency action [1] must mark the consummation of the agency's decisionmaking process, and [2] must either determine rights or obligations or occasion legal consequences") (quotations omitted). The finality inquiry, we are told, is a "flexible" and "pragmatic" one. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967).

### III.

Air Brake claims that we have jurisdiction to review three distinct actions by the agency: (1) the Chief Counsel's statements (in each letter) that Air Brake's product fails to satisfy the general requirements of Standard 121; (2) the Chief Counsel's legal interpretation (in each letter) of Standard 121's warning-light requirement; and (3) the authority of the Chief Counsel to issue the letters in the first place. As each of these issues presents a distinct finality question, we examine them separately.

### A.

The essential content of each letter, explaining why Air Brake's product generally does not comply with Standard 121, is not final agency action under § 10 of the APA. First and foremost, "[a]n agency action is not final if it is . . . 'tentative'" in nature. *Franklin v. Massachusetts*, 505 U.S.

788, 797 (1992) (quoting *Abbott Labs.*, 387 U.S. at 151); *see Bennett*, 520 U.S. at 178 (a "tentative" action is not final). And agency letters based on hypothetical facts or facts submitted to the agency, as opposed to fact-findings made by the agency, are classically non-final for this reason. *See Nat'l Res. Def. Council v. FAA*, 292 F.3d 875, 882 (D.C. Cir. 2002) (holding that an opinion letter issued by the FAA "based on a hypothetical factual situation" presented to the agency by the parties was "not appropriate for review"); *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780–81 (9th Cir. 2000) (holding that a letter from the general counsel of the Department of Health and Human Services was not final where facts remained to be developed).

Both letters suffer from this defect. By their terms, they state tentative conclusions based on limited information presented to the agency. For example, the June 4th letter states that it "represents our opinion based on the facts presented in [MAC Trailer's] letter, the attachments provided with [MAC Trailer's] letter and agency review of other data obtained from [Air Brake]." J.A. at 172. Later, the letter stresses that "NHTSA's view" about the MSQR-5000 is "based on a review of the promotional materials describing the device and the principles involved in its operation." J.A. at 172; *see* J.A. at 173 ("The MSQR-5000 *appears* to lack one or more features that an ABS must have to meet [Standard] 121. *Based on the literature provided to us*, the MSQR-5000 does not *seem* to have any means of automatically controlling wheel slip during braking by sensing, analyzing, and modulating the rate of angular rotation of a wheel or wheels.") (emphasis added); *id.* ("In addition, the MSQR-5000 also *appears* to lack any provision for illuminating a warning light providing notification of an ABS malfunction.") (emphasis added). The December 10th letter, too, relies on "materials received or obtained since June 4, as well as those that we had previously obtained," J.A. at 192, and disclaims any intent to adjudicate factual issues. *See* J.A. at 194 ("[I]t is not the function of an interpretive letter to adjudicate factual issues . . . ."). In this respect, the second

letter also expresses an opinion based on "[t]he test data and information provided by [Air Brake]," not based upon any factfinding by the agency. J.A. at 198.

By itself, the conditional nature of the Chief Counsel's advice—conditioned on the untested factual submissions of the parties—suggests that it is non-final and non-reviewable. But the regulatory context in which the issue arises makes that conclusion all the more appropriate. In the world of vehicle safety requirements, fact-specific conclusions about whether a product complies with NHTSA's regulations generally come at the end of a recall proceeding, not before the process for initiating a recall has begun. As the applicable statutes explain, the Secretary generally must follow a carefully-delineated process for reaching a conclusion of non-compliance that has the force of law. The Secretary must make an "initial decision" that a product does not comply. *See* 49 U.S.C. § 30118(a) (requiring the Secretary to notify a manufacturer "immediately after making an initial decision . . . that [a] vehicle or equipment . . . does not comply with an applicable motor vehicle safety standard"). After that, the Secretary follows a specific process for making "a final decision" about compliance. *See id.* § 30118(b)(1) (describing the process for making "a final decision that a motor vehicle or replacement equipment . . . does not comply with an applicable motor vehicle safety standard"). Then, if appropriate, the Secretary may order non-complying manufacturers to remedy the problem through notice to the vehicle owners and a recall (or other remedy). *See id.* § 30118(b)(2) (requiring the Secretary, upon making a final decision, to "order the manufacturer" to notify owners and remedy the noncompliance). This systematic method for making a fact-based determination whether a given product satisfies the agency's safety regulations is a far cry from the informal answers provided by NHTSA's Chief Counsel to questions from Air Brake's potential customer.

Besides being conditional and tentative and besides arising outside of the customary setting for determining safety

compliance, the main body of each letter contains a related flaw: "An agency action is not final if it is only 'the ruling of a subordinate official.'" *Franklin*, 505 U.S. at 797 (quoting *Abbott Labs.*, 387 U.S. at 151). While NHTSA's Chief Counsel has considerable authority over purely legal interpretations of pertinent statutes and regulations, the Secretary has not delegated authority to the Chief Counsel to make final fact-bound determinations of compliance with NHTSA's safety standards. *Compare* 49 C.F.R. § 501.8(d)(5) (the authority to "[i]ssue authoritative interpretations of the statutes administered by NHTSA and the regulations issued by the agency" is "delegated" to the Chief Counsel), *with id.* § 501.7(a)(2) (the authority to "[m]ake final decisions concerning alleged safety-related defects and noncompliance with Federal motor vehicle safety standards" is "reserved to the Administrator"). *See* Gov. Br. at 17 ("[T]he Chief Counsel [is] a subordinate agency official who may interpret the laws and regulations but may not initiate recalls or determine that a motor vehicle fails to comply with an applicable safety standard . . . ."). For this reason as well, the letters do not constitute final agency action with respect to their advice about whether Air Brake's product complies with Standard 121.

B.

A different analysis, but a similar conclusion, applies to the legal interpretation in each letter of Standard 121's warning-light requirement. While the letters in the main address fact-specific issues based upon the materials presented to the agency by the parties requesting the opinion, they also appear to contain a statement of general applicability designed to interpret the law—namely, that Standard 121 requires all antilock brake systems, even non-electronic ones, to include a warning light.

One cannot lightly dismiss this legal interpretation of Standard 121 as either tentative or as the view of a subordinate agency official. There is nothing provisional

about this interpretation of the standard: Either it requires a warning light or it does not. And there is nothing hypothetical or intricately fact dependent about the inquiry: Either Air Brake's product has these features or it does not. Neither are these the views of a subordinate official, at least when it comes to this purely-legal interpretation. The Secretary of Transportation has delegated to NHTSA's Chief Counsel responsibility to "[i]ssue authoritative interpretations of the statutes administered by NHTSA and the regulations [*i.e.*, Safety Standards] issued by the agency." 49 C.F.R. § 501.8(d)(5). So unlike his general take on compliance, the Chief Counsel's views about purely legal questions—does, for example, Standard 121 require a warning light?—may constitute the final word within the agency. Bolstering the point, NHTSA's website states that the Chief Counsel's legal interpretation letters "represent the definitive view of the agency on the question addressed and may be relied upon." In view of the Secretary's delegation of authority to the Chief Counsel over legal issues and in view of NHTSA's public use of that authority through its website, an interpretive letter like this one (or at least partially like this one) may indeed represent the "consummation" of the agency's process as to purely legal questions.

To say that a legal interpretation is final because it is not subject to further review within the agency, however, is not to say that it is "final" in the sense that § 10 of the APA requires it to be. If the interpretation nonetheless (1) does not "determine rights or obligations" or (2) does not have "legal consequences," it remains non-final for purposes of review under the APA. *See Bennett*, 520 U.S. at 178. Neither measure of finality is availing to Air Brake here. An agency's determination of "rights or obligations" generally stems from an agency action that is directly binding on the party seeking review, such as an administrative adjudication (like a recall proceeding) or legislative rulemaking, both of which did not happen here.

The harder question is whether the letters, while not directly binding on Air Brake, occasion sufficient "legal consequences" to make them reviewable. One reliable indicator that an agency interpretation still has the requisite legal consequence, we have held, is whether the agency may claim *Chevron* deference for it. *See Franklin Fed. Sav. Bank v. Dir., Office of Thrift Supervision*, 927 F.2d 1332, 1337 (6th Cir. 1991) ("When an agency has acted so definitively that its actions are defended based on *Chevron*, we believe that its action should be treated as final."); *id.* ("As a general rule, final agency action includes 'interpretive decisions that crystalize or modify private legal rights.'") (quoting *FTC v. Standard Oil of Cal.*, 449 U.S. 232, 247 (1980) (Stevens, J., concurring)); *see also Isle Royale Boaters Ass'n v. Norton*, 330 F.3d 777, 786 & n.2 (6th Cir. 2003) (noting that letters from the Park Service to park visitors containing an interpretation of the statute the Park Service was charged with administering did not constitute "final rulings of the agency" because they would be entitled only to respect by the courts, not *Chevron* deference); *cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) (holding that a court must uphold an agency's reasonable interpretation of a statute that it administers unless "the intent of Congress is clear" as to the "precise question at issue" or the agency's interpretation is "unreasonable").

Decisions from other courts also have looked to the eligibility for administrative deference as a sufficient legal consequence for finality purposes. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 437 (D.C. Cir. 1986) ("EPA's interpretation of FIFRA has a significant legal effect on Ciba-Geigy. It is well settled that the authoritative interpretation of an executive official has the legal consequence, if it is reasonable and not inconsistent with ascertainable legislative intent, of commanding deference from a court . . . .") (quotation omitted); *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) ("When a general, interpretative ruling [in the form of a letter] signed by the head of an agency has been crystallized following

reflective examination in the course of the agency's interpretative process, and is accordingly entitled to deference not only as a matter of fact from staff and citizenry expected to conform but also a matter of law from a court reviewing the question, there coexist both multiple signposts of authoritative determination, finality and ripeness . . . .").

This treatment of *Chevron* deference as a relevant "legal consequence" remains sound even though the test for obtaining *Chevron* deference has changed in recent years. In *United States v. Mead Corporation*, 533 U.S. 218 (2001), the Court held that only those administrative interpretations that Congress and the agency intend to have the "force of law," as opposed to those merely characterized as "authoritative," qualify for *Chevron* deference. *See id.* at 229; *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."). Under either test, the critical point is that federal courts *must* accept reasonable agency interpretations of an ambiguous statute even if they would have construed the statute differently had they been given the chance in the first instance. Because it is the binding effect of agency interpretations eligible for *Chevron* deference that establishes "legal consequences will flow" from them, *Bennett*, 520 U.S. at 178–79 (quotation omitted), *Mead*'s changes to the test for determining when *Chevron* applies (whether large or small) do not alter the relevance of this inquiry.

If the Supreme Court's recent decisions concerning administrative deference signal any change, it is that less agency action will qualify for *Chevron* deference and less agency action accordingly may qualify for federal-court review. Cases will arise involving informal agency actions that once received, but no longer receive, *Chevron* deference in the aftermath of *Mead* and *Christensen*. *See Mead*, 533 U.S. at 232 ("[I]nterpretive rules . . . enjoy no *Chevron* status

as a class."); *compare Johnson City Med. Ctr. v. United States*, 999 F.2d 973, 977 (6th Cir. 1993) ("[T]his Court accords deference to Revenue Ruling 85-74 under the standard set forth in *Chevron*."), *with Aeroquip-Vickers, Inc. v. Comm'r*, 347 F.3d 173, 181 (6th Cir. 2003) ("In light of the Supreme Court's decisions in *Christensen* and *Mead*, we conclude that Revenue Ruling 82-20 should not be accorded *Chevron* deference."); *compare Nat'l Automatic Laundry*, 443 F.2d at 702 (holding that an opinion letter by the administrator of the Wage and Hour Division of the Department of Labor interpreting the Fair Labor Standards Act was final agency action in part because it would be "entitled to deference . . . as a matter of law from a court reviewing the question"), *with Christensen*, 529 U.S. at 586–87 (holding that an opinion letter by the administrator of the Wage and Hour Division of the Department of Labor interpreting the Fair Labor Standards Act was not entitled to deference as a matter of law, but only "respect" to the extent that it has the "power to persuade"). Correspondingly, cases will now arise involving agency action that we once might have considered "final" for APA-review purposes as a result of *Chevron*'s legal effect but that we will no longer consider final because *Chevron* does not apply. But this is a small price to pay for adhering to the principle that justifies factoring eligibility for deference into eligibility for federal-court review in the first place—that the application of *Chevron* indicates agency interpretations will have "legal consequences"—an approach we have taken before in this Circuit, *see Franklin Fed. Sav. Bank*, 927 F.2d at 1337, and an approach we stand by today.

Air Brake, however, cannot rely upon this principle because the Chief Counsel's legal interpretations have no claim to deference of any sort. For one reason, they are too informal. Congress does not generally expect agencies to make law through general counsel opinion letters. *See Christensen*, 529 U.S. at 587 ("opinion letters . . . lack the force of law"); *Heimmermann v. First Union Mortgage Corp.*, 305 F.3d 1257, 1262 (11th Cir. 2002) ("[L]etters from HUD's general

counsel to members of Congress . . . are the kinds of informal policy positions that lack the force of law and are unentitled to *Chevron* deference."), *cert. denied*, 123 S. Ct. 2641 (2003); *Am. Express Co. v. United States*, 262 F.3d 1376, 1382 (Fed. Cir. 2001) ("[An] interpretation . . . contained in [a] General Counsel Memorandum . . . [that] is not reflected in a regulation adopted after notice and comment [] probably would not be entitled to *Chevron* deference."); *cf. Hosp. Corp. of Am., v. Comm'r*, 348 F.3d 136, 144 (6th Cir. 2003) ("In *Mead Corporation*, the Court found that Congress had not implicitly delegated law-interpreting authority through the 10,000 to 15,000 tariff rulings made each year by forty-six different Customs offices without notice and comment procedures.").

For another reason, the letters interpret a regulation (Standard 121), not the statute that the agency is charged with enforcing (the Safety Act). *Chevron* does not apply in this setting. *See Christensen*, 529 U.S. at 587–88 (distinguishing *Chevron* deference—the deference accorded an agency's interpretation of a statute—from the deference accorded an agency's interpretation of its own regulation); *Am. Express Co.*, 262 F.3d at 1382–83 ("[W]e are not dealing with an agency's interpretation of a statute and issues of *Chevron* deference, but with the IRS's interpretation of an ambiguous term in its own Revenue Procedure.").

Other administrative-law doctrines do not advance Air Brake's cause either. Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), federal courts give respectful consideration to authoritative interpretations that lack the force of law, but that nonetheless have the "power to persuade." *Id.* at 140; *see Mead*, 533 U.S. at 234 ("*Chevron* did nothing to eliminate *Skidmore*[]" and an informal interpretation "may therefore at least seek a respect proportional to its power to persuade.") (quotation omitted). Unlike *Chevron* deference, however, *Skidmore* respect is not the kind of "legal consequence[]" that may make an interpretation final for purposes of direct review: *Skidmore* permits courts to give consideration to an

agency's expertise and ability to persuade, not its ability to speak with legal effect. Put another way, *Chevron* allows the agency to make law, which is what gives the agency's views "legal consequences," while courts still determine the meaning of a law under *Skidmore*. *Skidmore* thus permits an agency to *earn* the weight given to it by the courts, while *Chevron* gives reasonable agency interpretations controlling weight as *a matter of right*. *See* Thomas W. Merrill & Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833, 855–56 (2001). The result is that "legal consequences" do not flow from the *Skidmore* doctrine, and accordingly its application does not assist a court in determining that an agency's action is final under the APA.

The better candidate for finding the requisite "legal consequences" is still another administrative-law doctrine—*Seminole Rock* deference—the "controlling weight" that federal courts generally give an agency's interpretation of its own ambiguous regulation. *See Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (an agency's interpretation of its own regulation is entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation"); *see also United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001) (granting *Seminole Rock* deference to the IRS's "longstanding interpretation of its own regulations"); *Jean v. Nelson*, 472 U.S. 846, 865 (1985) (noting the "similar[ity]" between the *Chevron* and the *Seminole Rock* "presumptions"). *Seminole Rock* deference appears to have survived *Mead*. *See Mead*, 533 U.S. at 246 (Scalia, J., dissenting) ("[T]he court leaves untouched today [] [the principle] that judges must defer to reasonable agency interpretations of their own regulations."); *United States v. Cinemark USA, Inc.*, 348 F.3d 569, 578 (6th Cir. 2003) (post-*Mead* decision invoking the doctrine); *A.D. Transport Express, Inc. v. United States*, 290 F.3d 761, 766 (6th Cir. 2002) (same); *Am. Express*, 262 F.3d at 1382–83 (holding that *Mead* did nothing to alter *Seminole Rock*). The controlling nature of *Seminole Rock* deference, moreover, would seem to have the requisite legal

consequences for APA finality purposes. *Cf.* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 615 (1996) ("Because agency rules that comply with specified procedural formalities bind with the force of statutes, *Seminole Rock* has a significant impact on the public's legal rights and obligations.") (footnote omitted).

Nonetheless, the doctrine does not apply here. In this case, the Department of Justice emphatically denies that the opinion letters issued by NHTSA's Chief Counsel are authoritative views entitled to *any* deference. While that position is supported by dicta from at least one case from this court, *see Fisher v. Ford Motor Co.*, 224 F.3d 570, 575 (6th Cir. 2000) ("[T]he General Counsel [of NHTSA's] opinion [interpreting Standard 208] is not legally binding on the courts."), cases from other circuits (dealing with general counsel letters from different agencies) appear to reach a different conclusion, *see, e.g., Am. Express Co.*, 262 F.3d at 1382 (granting *Seminole Rock* deference to an interpretation contained in an opinion letter by the general counsel of the IRS); *Gavey Prop./762 v. First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 521 (5th Cir. 1988) (holding that a published advisory letter from the general counsel of the Federal Home Loan Bank Board is entitled to deference as a matter of law); *cf. Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 94 (1973) (noting that an opinion letter from the general counsel of the EEOC expressed the interpretation of the commission). Either way, as this case suggests, it is one thing for an agency's general counsel to have authority to issue definitive interpretations on behalf of the agency; it is another for the general counsel to invoke that authority. *See Mead*, 533 U.S. at 232 (recognizing that while Customs *has* "general rulemaking power" to promulgate rules with "the force of law," it does not *exercise* that power when it issues classification rulings). We accept the Government's acknowledgment that the opinion letters here are not entitled to any deference in the federal courts—whether under *Chevron* or *Seminole Rock*—and thus do not have legal

consequences. Having no direct, binding effect on Air Brake and having no legal consequences for Air Brake by virtue of the deference courts might give to them, the Chief Counsel's letters are not "final" agency action under the APA.

C.

Air Brake offers several arguments in favor of reviewing the compliance and legal interpretations in the letters, all unpersuasive. It first contends that a decision not to review the letters fails to heed *Abbott Laboratories'* admonition to apply the finality requirement in a "flexible" and "pragmatic" way. 387 U.S. at 149–50. Most pragmatically, Air Brake urges, the views expressed in the letters have devastated its business, effectively foreclosing it from selling the MSQR-5000 to vehicle manufacturers regulated by NHTSA, none of which appears willing to run the risk of a government-ordered recall. While this may be so, adverse economic effects accompany many forms of indisputably non-final government action. Initiating an enforcement proceeding against a company, for example, may have a devastating effect on the company's business, but that does not make the agency's action final. *See FTC v. Standard Oil Co.*, 449 U.S. 232, 243 (1980) (holding that an administrative complaint is not a final agency action because a complaint "ha[s] no legal force or practical effect upon [] daily business other than the disruptions that accompany any major litigation"); *Greater Detroit Res. Recovery Auth. v. EPA*, 916 F.2d 317, 322 (6th Cir. 1990) (holding that a letter "convey[ing] the intent of the EPA to commence proceedings to investigate the revocation of the permit" was not final agency action); *Aerosource, Inc. v. Slater*, 142 F.3d 572, 581 (3d Cir. 1998) (holding that advisory warnings issued by the FAA to Aerosource and letters issued by the FAA refusing to rescind the warnings were not reviewable because, despite their "severe adverse impact" on Aerosource's business, the actions had no legal consequences); *Ind. Safety Equip. Ass'n v. EPA*, 837 F.2d 1115, 1121 (D.C. Cir. 1988) (holding that an EPA report recommending against using the plaintiff's respirators was

not final despite economic harm to plaintiff's business, because the effects were "indirect and arise from the reactions and choices of industry customers"); *Air Cal. v. Dep't of Transp.*, 654 F.2d 616, 621–22 (9th Cir. 1981) (holding that a legal interpretation contained in a letter from the general counsel of the FAA to a local airport was non-final despite the serious indirect effects on Air California's business).

Contrary to Air Brake's assertion, moreover, this approach does not place the company in a "Catch-22" position. Reply Br. at 1. In Air Brake's view, no manufacturer will ever put the MSQR-5000 on its new vehicles given the risks of a recall. No recall, as a result, will ever occur, making NHTSA's views about Air Brake's product (and, worse, the Chief Counsel's views on the subject) effectively unreviewable—because only the results of a recall proceeding would be final and reviewable. Even if this were true, which it turns out it is not, this development would stem from the market's weighing of the costs (one of which is the possibility of government action) and benefits of purchasing Air Brake's product, not the government's tentative response to an inquiry posed by a potential Air Brake customer.

In all events, Air Brake errs in suggesting it has no other options. The company remains free to show the market its confidence in the product by agreeing to indemnify a prospective manufacturer against the costs of defending any potential NHTSA action. And more importantly (and perhaps more realistically for smaller companies), the company remains free to petition NHTSA to alter Standard 121 under the agency's rulemaking powers. 49 C.F.R. § 552.3(a) ("Any interested party may file with the Administrator a petition requesting him . . . [t]o commence a proceeding respecting the issuance, amendment or revocation of a motor vehicle safety standard."). The denial of such a petition, notably, *would be a final reviewable order. See Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1037 (D.C. Cir. 2002) ("[A]n agency's denial of a petition to initiate a rulemaking for the repeal or

modification of a rule is a final agency action subject to judicial review.").

Nor is it true that the agency is trying to have it both ways—by simultaneously claiming (1) that the letters represent "the definitive view of the agency" on their website and (2) that the letters may not be reviewed because they are non-final for APA purposes. For one, the website contains "A Word of Caution" to readers indicating the conditional nature of the letters. "[P]lease be aware," it says, "that [these interpretations] represent the views of the Chief Counsel based on the facts of individual cases at the time the letter was written." For another, the website makes it clear that the Chief Counsel has authority to "interpret[] the statutes that the agency administers and the regulations that it promulgates," not to find facts or apply the agency's regulations to disputed facts. For still another reason, the agency has now disclaimed that the letters are the definitive view of the agency, no matter what the website says. Having acknowledged that the Chief Counsel's letters in this instance are not binding on Air Brake and are not entitled to any deference in any respect, whether under *Chevron* or *Seminole Rock*, the agency has made clear that the letters are simply advisory opinions about a set of facts presented to the Chief Counsel. In the final analysis, these letters do not constitute "final" agency action subject to review under the APA.

D.

Although the letters do not constitute final agency action with respect to the opinions expressed in them, they do represent final agency action in another respect—namely, as to whether the Chief Counsel has authority to issue advisory opinions in the first instance. In contrast to the contents of the letters, all of the finality factors point to the conclusion that the agency's view regarding the Chief Counsel's authority to issue them is "final" agency action under the APA.

First, there is nothing tentative or fact dependent about the authority to issue the letters. The Secretary has delegated this power to the Chief Counsel in concrete and unconditional terms, and the issue is purely a legal one. *See* 49 C.F.R. § 501.8(d)(5) ("The Chief Counsel is delegated authority to . . . [i]ssue authoritative interpretations of the statutes administered by NHTSA and the regulations issued by the agency."). Second, as the head of the Department of Transportation, the Secretary is anything but a subordinate official for these purposes. Third, this decision would receive deference from the federal courts as an interpretation of the agency's regulations under *Seminole Rock*, and (in contrast to the letters) the agency has not disclaimed deference regarding this position. *See Martin v. Occupations Safety & Health Review Comm'n*, 499 U.S. 144, 150 (1991) ("It is well established 'that an agency's construction of its own regulations is entitled to substantial deference.'") (quoting *Lyng v. Payne*, 476 U.S. 926, 939 (1986)). And that deference is particularly appropriate here since the Chief Counsel began issuing interpretive letters in 1967, within months of the passage of the Safety Act in 1966, and has continuously done so since. *See Cleveland Indians Baseball Co.*, 523 U.S. at 220 ("We do not resist according such deference in reviewing an agency's steady interpretation of its own 61-year-old regulation implementing a 62-year-old statute.").

Case law points to the same conclusion. In *Ciba-Geigy*, the EPA issued a series of pronouncements (letters and mailgrams) suggesting two things: (1) if Ciba-Geigy did not change the label of its pesticide from "general use" to "restricted use," its product would be in violation of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA); and (2) FIFRA's requirement that the agency conduct a formal hearing before cancelling a pesticide's registration or changing its classification was not the only means by which the EPA may require changes to the product's labeling. 801 F.2d at 432–33. Ciba-Geigy filed suit challenging the second determination and seeking to enjoin the EPA from "imposing

labeling changes and use restrictions on a registered product without affording the procedures mandated by . . . FIFRA," namely notice and a formal hearing. *Id.* at 433. The district court dismissed the complaint for lack of finality, holding that the EPA "'ha[d] neither issued a final order directed to the plaintiff Ciba-Geigy nor taken any other final action which is reviewable by the Court.'" *Id.* at 434 (quoting *Ciba-Geigy Corp. v. EPA*, 607 F. Supp. 1467, 1468 (D.D.C. 1985)).

On appeal, the D.C. Circuit reversed, holding that the EPA pronouncements about what procedures it may use to require labeling changes constituted final agency action within the meaning of the APA and were ripe for review. *Id.* at 434–39. It first concluded that the case presented a "purely legal issue." *Id.* at 435. The only question was "whether EPA properly construed FIFRA to allow it to impose labeling changes on registered pesticides without following the cancellation process prescribed [under FIFRA]," a question of "statutory interpretation" that would not be "facilitated by further factual development." *Id.* It then noted that "EPA's Director of Pesticide Programs unequivocally stated EPA's position on the question whether registrants were entitled to a cancellation hearing before labeling changes could be required." *Id.* at 436. "[T]he statement," the court added, "gave no indication that it was subject to further agency consideration or possible modification," *id*. at 437, and the court had "no reason to believe that the EPA Director of Pesticide Programs lacks authority to speak for EPA on this issue or that his statement of the agency's position was only the ruling of a subordinate official that could be appealed to a higher level of EPA's hierarchy." *Id.* Next, the court reasoned, "EPA's interpretation of FIFRA ha[d] significant 'legal . . . effect[s]' on Ciba-Geigy," *id.* at 437, because of the deference it would have received under *Chevron* (as the courts then applied the *Chevron* doctrine). "We can divine no reason why the letter from the head of EPA's Pesticide Division, speaking for the agency charged with administering FIFRA, would not be entitled to deference from the least dangerous branch." *Id.* Finally, it noted that Ciba-Geigy

would suffer financial hardship if review were postponed. *Id.* at 438. *See also Bennett*, 520 U.S. at 178 (holding that, for purposes of a lawsuit by several third parties against the Fish and Wildlife Service, a "biological opinion" issued by the Fish and Wildlife Service to the Bureau of Reclamation constituted final agency action, because it represented the consummation of the Service's decisionmaking process and it "alter[ed] the legal regime to which the [the Bureau] [wa]s subject, authorizing [the Bureau] to take the endangered species if (but only if) it complies with the prescribed conditions").

IV.

Because we have jurisdiction to review the Chief Counsel's authority to issue these letters, we must decide whether this was a permissible exercise of power. Like the district court before us, we conclude that it was. Congress, to begin with, has delegated lawmaking power to the Secretary, 49 U.S.C. § 30111(a) ("The Secretary of Transportation shall prescribe motor vehicle safety standards."), and a "component of the agency's delegated lawmaking powers" is "the power authoritatively to interpret its own regulations," *Martin*, 499 U.S. at 151. *See also* 5 U.S.C. § 301 ("The head of an executive department . . . may prescribe regulations for the government of his department, the conduct of its employees, [and] the distribution and performance of its business . . . ."). Congress also has instructed the Secretary to promote regulatory compliance and further highway safety, 49 U.S.C. § 30101, and to "consult . . . with . . . interested persons" in doing so, *id.* § 301(8), two directives that fairly encompass the authority of the Secretary and subordinate officials to communicate with manufacturers like MAC Trailer in a variety of formal and informal ways, not just through recall orders or formal petitions for review.

No less importantly, Congress separately requires all federal agencies, including NHTSA, "to answer inquiries by small entities concerning information on, and advice about,

compliance with statutes and regulations." Small Business Regulatory Enforcement Fairness Act of 1996, § 213(a), 110 Stat. 858–59, 5 U.S.C. § 601 note. That is exactly—and quite sensibly—what happened here. MAC Trailer indeed is precisely the kind of business that this law was designed to benefit. Finally, the Secretary has delegated this authority to the Chief Counsel by issuing a regulation allowing the Chief Counsel to "[i]ssue authoritative interpretations" of NHTSA's safety regulations, 49 C.F.R. § 501.8(d)(5), a reasonable interpretation of which contemplates not just purely legal pronouncements, but advisory opinions tied to real facts presented by real parties.

Attempting to rebut these sources of authority, Air Brake contends that opinion letters conflict with § 30118's notice-and-hearing requirements, which describe the process by which the agency may determine that a vehicle is defective and may order its recall. By issuing a "compliance determination . . . in the guise of [] opinion letters," Appellant's Br. at 13, 17, Airbrake claims, the Chief Counsel has seized "unfettered power to solely decide which automotive equipment enters the stream of commerce." We disagree. The practice of issuing advisory opinions on matters of compliance does not conflict with this statutory process because the two endeavors serve different functions: Advisory opinions advise, while final orders bind and compel. Only the most inefficient, strange and unworkable of administrative schemes would require the Secretary and his delegates to remain tight-lipped about all matters of compliance unless and until the Secretary ordered a manufacturer to recall its product. That Congress not only delegated rulemaking authority to the Secretary (including the implicit power to interpret the agency's own safety regulations), but also required him to "consult" with the industry and "answer inquiries by small entities concerning . . . advice about and compliance with" NHTSA's regulations, proves that Congress did not contemplate the kind of passive-aggressive, to say nothing of suspense-filled, administrative behavior that Air Brake's position would require.

In our view, moreover, manufacturers like MAC Trailer and suppliers like Air Brake ultimately have much to gain from the availability of advisory opinions. Section 30118's process for determining that a vehicle "*does not* comply with an applicable motor vehicle safety standard" requires a vehicle that has already been built, and says nothing about how the agency might inform curious manufacturers and suppliers about what hypothetically *would not* comply with NHTSA's safety regulations. The ability to receive NHTSA input early in the process (however tentative and however non-binding it may be) before investing resources in manufacturing and selling a product surely offers as much benefit to suppliers like Air Brake as it provides to the companies that build the vehicles and the consumers who buy them. *See Nat'l Automatic Laundry*, 443 F.2d at 699 ("[T]he concerns of businessmen engaged in forward planning may rightly call for hypothetical or advisory consultation with cognizant government officials, in order to obtain informal predictions needed to permit optimum allocation of resources in the light of careful assessments of the alternatives.").

V.

For the foregoing reasons, we affirm the judgment of the district court.